*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 08-122-P-H* |
| | ) | |
| *ANTHONY JONES,* | ) | |
| | ) | |
| *Defendant* | ) | |

*MEMORANDUM DECISION ON MOTION TO RECONSIDER AND RECOMMENDED*
*DECISION ON MOTIONS TO DISMISS AND TO SUPPRESS*

The defendant, Anthony Jones, charged with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), Indictment (Docket No. 20), moves for reconsideration of my decision on the government's *ex parte* request that I review certain material *in camera* to determine whether it should be provided to the defense under either *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972), for dismissal of the indictment due to alleged government misconduct, and for suppression of evidence seized and statements made during the course of the arrest giving rise to the indictment.  I deny the motion for reconsideration and recommend that the court deny the motions to dismiss and to suppress.

### I.  Motion to Reconsider

As a courtesy, at a conference of counsel on the day before the hearing on the defendant's motions to dismiss and to suppress (Docket No. 68), I informed counsel for the defendant that the government had moved *ex parte* for a ruling on the question of whether certain materials were required to be disclosed to the defendant under *Giglio* and that I had ruled that the materials need not be disclosed.  Two weeks later, the defendant filed the instant motion to reconsider,

1

reciting the case law applicable to the government's duty to disclose information in criminal cases and asserting that "[t]he in camera inspection and evaluation process authorized by [*United States v.*] *Henthorn*[, 931 F.2d 29 (9th Cir. 1991),] is not mandated to be an *ex parte* process," and that he should be provided with "disclosure of the subject, nature or substance of [the] documents" in order to avoid "effectively den[ying the defendant] the opportunity to argue [that] the documents (or information) is material evidence that should have been made available . . . to impeach the credibility of witnesses."  Defendant[']s[] Motion for Disclosure of Documents Reviewed in Camera and Reconsideration of this Court's Giglio Order (Docket No. 76) at 2.

My decision on the government's submission, explained in an order filed under seal (Docket No. 69), was made after full consideration of the applicable case law.  If defense counsel were entitled to "disclosure of the subject, nature or substance" of the materials submitted to me by the government, the value of the *in camera* procedure would be lost.  *See United States v. Innamorati*, 996 F.2d 456, 488 (1st Cir. 1993) (interests of justice better served by court resolution of questions of disclosure).  The procedure followed in this case is clearly contemplated by Fed. R. Crim. P. 16(d)(1) and has been expressly approved by federal courts that have addressed the question.  *E.g., United States v. Hamaker*, 455 F.3d 1316, 1328 n.11 (11th Cir. 2006); *United States v. Orena*, 145 F.3d 551, 560 (2d Cir. 1998); *United States v. Pugh*, 2003 WL 22132912 (D. Conn. Aug. 29, 2003), at *1.  In *Henthorn*, the case cited by the defendant, access to the law enforcement officers' personnel files at issue, before they were reviewed for materiality by the court, was not raised as an issue.

The defendant's motion for reconsideration is **DENIED**.

## II.  Proposed Findings of Fact

An evidentiary hearing was held before me on October 30, November 13, and November 18, 2008, on the motions to dismiss and to suppress.  The defendant appeared with counsel.  Twenty-two exhibits were offered by the defendant and admitted, two over objection by the government.  Seven exhibits were offered by the government and admitted without objection.  The defendant called three witnesses with respect to his motion to dismiss; the government called four witnesses on both motions.  The defendant called one witness and testified himself with respect to the motion to suppress.  The government called one rebuttal witness, as did the defendant in surrebuttal.

These proposed findings of fact apply to both motions.

On May 29, 2008, Ernest MacVane was a task force agent working with the Drug Enforcement Agency ("DEA"); at the time of the hearing he had returned to his previous position at the Windham Police Department.  On May 29, an anonymous call was transferred to him because he was the only DEA agent available at the time.  He did not recognize the caller's voice, and the call was not recorded.  The male caller wanted to report trafficking in crack cocaine.  He said that he had recently used cocaine and had recently purchased cocaine at 31 Saugus Street in Portland.  He said that a red and black Saab or Audi at that address was associated with drug sales and that Maria Strong was at that address, along with four males, two of whom were armed with handguns.  He said that all four males were black, were from Massachusetts, and used that house to store drugs and money.  He said that he had seen about one ounce of crack cocaine while he was in the house, and that a silver car parked on an adjacent street held a large quantity of cocaine base.

The caller refused to identify himself; he called himself "a concerned citizen" and professed fearing the people in the house.  The call lasted about 5 minutes.  Immediately thereafter, MacVane drove to the neighborhood of 31 Saugus Street in an attempt to corroborate the information.  He saw cars in the driveway at 31 Saugus Street as they had been described by the caller, and on a cross street, parked within view from the back of the house, he saw a silver Toyota with Massachusetts license plates.  He "ran the plates" on the Toyota and learned that it was registered to Lemmie Nunes.  MacVane knew that Lemmie Nunes had rented a motel room at the Merry Manor, and that the room's resident, one Odawa, had been arrested on May 12, 2008, in a case in which crack cocaine and money had been recovered.  The silver Toyota was parked unusually far from 31 Saugus Street, but not unusually so if it was being used by drug traffickers who would want to keep the car from being associated with 31 Saugus Street while keeping it visible from that house.

A check with the Division of Motor Vehicles confirmed that Maria Strong lived at 31 Saugus Street.  MacVane recognized her name because he had arrested her in June 2006 in a case in which he had seized 4 to 6 ounces of crack cocaine from her companion, Victor Montalvo. Government Exhibit 8 is a so-called NADDIS printout regarding Strong that was made at the DEA office after the anonymous call was received and before the arrest of the defendant.   The printout indicates that the United States Attorney's office had declined to prosecute Strong in connection with this incident.

Surveillance was set up and a drug-sniffing dog and its handler were called to the scene. The handler posed as a resident walking his dog because he would be visible from 31 Saugus Street, and thus could only walk past the silver Toyota two times rather than circling it for some length of time.  The dog did not alert on the car.

4

MacVane maintained surveillance from his vehicle, which was parked on a dirt road at the corner of Saugus and Beverly Streets.  Agent Katherine Barnard of the DEA was parked at a point where she could see the silver Toyota but not the entire driveway into 31 Saugus Street. She observed a heavy-set black male cross Beverly Street, get into the silver Toyota, and drive away from her on Beverly Street.  Moments later, the car rounded the corner onto Saugus Street, with a lapse of time that would only have allowed the car to go around the block.  The car pulled up in front of the driveway to 31 Saugus Street.  Three other males got into the car, and it turned onto Beverly Street and again moved away from Agent Barnard.  Barnard,  MacVane, and other surveillance agents followed the car.

The car pulled in to the Global gas station on Forest Avenue.  Government Exhibit 6 is an aerial photograph of the gas station.  MacVane stopped on Forest Avenue north of the station. Joshua Guay, a police officer from Scarborough assigned to the DEA task force who had participated in the surveillance, also stopped his car on Forest Avenue.  David Bruni, a police officer from Gorham who was also assigned to the DEA task force, was in a vehicle that had stopped across the street from the gas station.  Paul Wolf, a DEA agent since 1995 stationed in Portland, was also in a vehicle near the gas station.  He was the ranking agent at the scene.

The agents considered this to be a high-risk operation, due to the tipster's statement that at least two of the individuals associated with the car were armed.  Each of the agents was assigned responsibility for one of the four occupants of the car.  When Wolf gave the signal to detain the car and its occupants, the agents pulled their vehicles into the gas station, positioning them around the Toyota so that it could not be driven away in any direction.  The agents were wearing civilian clothes with their badges displayed, and MacVane and Guay were wearing vests marked "police."  Agent Thomas D. Lapierre, a Biddeford police officer assigned to the DEA

task force, was riding with Wolf that day because he had earlier met Wolf at the DEA office when he went there to get his "raid" gear.

Lapierre was assigned to the left rear passenger, a white man named Justin. Bruni was assigned to the driver, Nunes, who was outside the car pumping gas when the officers arrived. MacVane was assigned to the defendant, who was the passenger in the front seat. Guay was assigned to the right rear passenger. Lapierre had his door open and jumped out before Wolf's vehicle came to a stop. Guay and MacVane approached the Toyota with their guns drawn. All of the officers were shouting "Police!" and directing the occupants and the driver to put their hands up. The right rear passenger complied with this directive, and Guay holstered his gun and told the passenger to step out of the car. The passenger complied, and Guay then handcuffed him.

Bruni and Wolf approached the driver, who was secured within seconds. The left rear passenger began to get out of the Toyota as Lapierre approached him, then ducked back into the car and came out again. Lapierre grabbed the passenger's right arm and took him to the ground, then handcuffed him, patted him down, and stood him up, bending him over the back of the Toyota.

Meanwhile, MacVane approached the front passenger door of the Toyota and ordered the defendant to put his hands in the air. When the defendant did not do so, MacVane reached over and opened the door. The defendant was sitting with his hands down at his sides and, despite repeated commands to put them up, moved his right hand toward his waist between the seat and his back. MacVane viewed this movement as threatening, as he knew that guns were tools of the drug trade and could be held in the back waistband of a man's pants. He kicked the defendant in the chest in order to keep his hands clear of any possible weapons and to disable him. The

defendant then slumped over, and MacVane holstered his weapon, grabbed the defendant's arm, and started to pull him out of the car.  Because the defendant was still not compliant, MacVane called for help.

MacVane got the defendant out of the car and put him face down on the pavement.  He tried unsuccessfully to get the defendant's hands into a position where he could apply handcuffs.  From his position near the driver, Bruni saw MacVane bent over on the other side of the Toyota, so he ran around the front of the Toyota to help MacVane.  Wolf also went around the car to help MacVane when he saw MacVane struggling with the defendant.  Barnard stayed with Nunes, the driver.  Lapierre heard someone say, "Give me your hands."

Wolf saw MacVane give the defendant two elbow strikes.  He did not hear the defendant saying that he could not breathe, nor did Bruni.  Wolf left MacVane and Bruni with the defendant as soon as the defendant was handcuffed, and he went into the gas station convenience store.  MacVane and Bruni applied some force to the defendant's back to prevent him from getting up, because if the defendant had done so, he would have come into contact with the point on the front passenger door, which remained open.   MacVane testified that it was possible that he knelt on the defendant's back while he was trying to put the defendant's hands into his handcuffs.

After the defendant had been handcuffed, Bruni conducted a visual search for weapons.  He saw that the defendant's pants were down around his buttocks and the top of his boxers was visible.  He pointed out to MacVane the corner of a plastic bag sticking out of the waistband of the defendant's boxers.  In his experience, Bruni knew that people tended to hide drugs in this area of their bodies.  Bruni removed the bag from the defendant's underwear, and he and MacVane sat the defendant up against the side of the Toyota.  MacVane believed the substance

7

in the plastic bag was crack cocaine.  The defendant was having difficulty breathing so MacVane called for an ambulance.  The defendant refused to identify himself when asked to do so.

Two Portland police officers did a thorough patdown of the defendant before he was placed in the ambulance and found a folding knife in the defendant's back pocket.  MacVane went to the hospital with the defendant and at one point had to grab the defendant's loose-fitting pants and pull them up because the defendant could not do so while in handcuffs.

Wolf went inside the store and spoke with the person working there to let him know what the police were doing outside.  He asked if the store had video surveillance running, because he had seen four cameras mounted on the canopy over the gas pumps.  The response to his question was "yes," and he assumed that meant that there would be videotape of what was going on outside.  He went back outside the store and informed the other agents that video was running.  Lapierre remembers that Wolf said words to the effect of "We are on camera."

No weapons or contraband were found in the car or on the other three occupants.  Guay, Wolf, and Bruni went back to 31 Saugus Street and were gone for about 15 minutes.  When they returned to the gas station, the Toyota and the other three occupants were released.  Defendant's Exhibit 18 is the report Barnard wrote about the incident.

Immediately after arresting the defendant, MacVane spoke with Assistant United States Attorney David Joyce and told him, *inter alia*, that there was a videotape record of the arrest.  Joyce told MacVane that he wanted a copy of the video of the arrest.  MacVane testified that he told Wolf that day that Joyce wanted a copy of the video, and that, when he told Wolf again of this request some days later, Wolf ordered him not to obtain the video or a copy of it.  He testified that, one or two days later, he again told Wolf that the video should be preserved, and that he also told the agent in charge of the Portland DEA office some two weeks later about the

8

request because he was not satisfied with Wolf's response.  Wolf testified that he recalled having a conversation with MacVane within a few days of the arrest in which MacVane said that he wanted to get the videotape and Wolf responded, "No, we don't need it."  He did not recall MacVane ever telling him that the assistant United States attorney wanted the videotape.

On May 30, 2008, while awaiting the commencement of the defendant's initial appearance, his attorney spoke with Wolf.  Stipulation (Defendant's Exhibit 3).  The attorney opined that, based upon her review of the complaint and affidavit, insufficient probable cause existed to arrest the defendant and that there was not sufficient legal justification to detain the suspects, including the defendant.  *Id.*  Wolf heard the attorney express these opinions.  *Id.*  Also on that day, the attorney advised Assistant United States Attorney Joyce that she anticipated filing a motion to suppress evidence in this case.  Stipulation (Defendant's Exhibit 4).

On June 13, 2008, Joyce e-mailed Wolf and MacVane asking, *inter alia*, whether they had obtained the video.  Wolf went to the gas station that day and spoke to someone working there, whom he did not think was the owner, who told him that there would have been video from May 29, but the system overwrote itself every Saturday, so any video from May 29, a Thursday, would have been erased two days after the incident.  Wolf did not specify to the employee that he was interested only in video of events outside the store, in the area of the gas pumps.

On August 28, 2008, MacVane taped a telephone conversation between himself and Wolf without Wolf's knowledge.  A tape of that conversation is Defendant's Exhibit 6, and the transcript of that tape is Defendant's Exhibit 7.  The conversation concerned MacVane's report that he had told Wolf that Joyce wanted the videotape.  By this time, MacVane had been advised that he was going to leave the task force, which upset him.  In the conversation, Wolf talked

about "the environment we work in," by which he meant a challenging relationship with the federal prosecutors.  He denied trying to change MacVane's view of the relevant events, and MacVane testified that he did not feel pressured by Wolf to change his story.  MacVane also testified that the tape was important to him because he had used physical force against the defendant that apparently hurt him, and the tape would have shown that he followed established procedure and used reasonable force, which would protect him if a claim of excessive force was brought against him.

Working on his own, MacVane sought a search warrant for the pants that the defendant was wearing on May 29.  Those pants are Defendant's Exhibit 20A, and the search warrant and a belt that the defendant says he was also wearing at the time of the arrest are Defendant's Exhibit 23.

On August 20, 2008, Wolf and Barnard served a subpoena for testimony at the hearing on the owner of the Global gas station, Soyev Patel.  Patel was angry because he had been contacted by the defendant's attorney, and the defendant's private investigator had come to the station, asking questions about the business without identifying herself.  The private investigator's report is Defendant's Exhibit 8.  Wolf explained what the subpoena called for and may have told him that the defendant faced a possible 10-year prison sentence.  He told Patel that, even if Patel could not provide the things that the subpoena directed him to bring, he would still have to go to court to explain that.  Wolf reported to Joyce that Patel told him during this encounter that the only video camera in the store on May 29 had been mounted on a window near the cash register and that it might have been moved slightly in the course of cleaning the window.

Patel's store sold water pipes and other items that could be used to consume illegal drugs. Wolf and Barnard both denied warning Patel that selling such things could be bad for him.  Patel

also denied that Wolf or Barnard spoke to him about the pipes that he sold in the store, although Wolf testified that there might have been a brief conversation about the possibility that some of the pipes for sale could be used as drug paraphernalia.  Barnard testified that this conversation was only between her and Wolf and did not involve Patel.

Patel was served with subpoenas by the government and the defendant.  He testified that he had no videotape of May 29, because the store's exterior camera system on that day was not working.  The four cameras on the canopy over the gas pumps had never worked in the time that Patel owned the gas station, and on May 29, the only working video cameras were inside the store.  None of those cameras was trained on the gas pump area.  Patel installed a new video recording system inside the store in June or July, 2008, a system that he had moved from a store he owned in Connecticut.  He had no receipts or other evidence of that new system or its installation, which he performed himself.  One camera inside the store now points toward the pumps, but, because the cashier can see pumps 1 and 2 from the window, that camera covers pumps 3 and 4, not pumps 1 and 2, where the events of May 29 took place.

Patel's brother, Sayed Patel, was working in the store on May 29.  The video cameras inside the store that day were hooked up to a monitor but were not recording anything.  If the recorder had been working, the cassette would have been taped over the next day. Patel denied telling the defendant's attorney on October 22, 2008, that the outside cameras were now functioning.  He denied telling Assistant United States Attorney Daniel Perry that a camera inside the store was focused on the gas pumps on May 29, 2008.  Patel remembered being asked if the camera currently in the window was in the same position it was in on May 29 and replying that he could not swear to that because someone might have bumped the camera while cleaning the window.

11

Patel wanted his employees to think that the gas station's surveillance system was better than it really was, so they would not have been able to give Wolf accurate information about the system.  His brother would have known which cameras were operating on May 29, but his brother was never asked that question.

On May 12, 2008, Wolf, MacVane, Guay, Bruni, and Barnard were involved in the arrest of one Odawa in which a drug-sniffing dog alerted on the suspect's groin, after which the suspect removed cocaine from the area of his buttocks.  Bruni saw the suspect do this; he believed that it was common for suspects to carry drugs in their buttocks.

Wolf interviewed Strong when she was arrested on June 22, 2006, with Montalvo. Montalvo was convicted while Strong was not prosecuted.  Wolf did not have any recollection of Strong as of May 29, 2008.  He testified that the agents did not enter the Global gas station on May 29, 2009, at a high rate of speed or with tires screeching; in fact, he encourages exactly the opposite approach to stopping a suspect vehicle in order to avoid accidents.

I will now recount the testimony of the defendant and that of his girlfriend, Melissa Roman.  Where that testimony conflicts with the testimony of one or more of the agents, I credit the testimony of the agents unless otherwise noted.

Roman testified that she and the defendant had been a couple for six years as of May 29, 2008, and were still together on that date.  She is the mother of one of the defendant's children. Defendant's Exhibit 23 is a belt that she purchased for the defendant and retrieved from the Cumberland County Jail after the defendant's arrest.  On May 29, the defendant weighed more than he did at the time of the hearing and his body was thicker.  The jeans that he was wearing on May 29 fit him securely around the waist, and he always wore the belt with them.  She never saw

his jeans slip down far enough to show his underwear.  His thighs were very large at the time and rubbed together.

Roman testified that she and the defendant had not separated before May 29 and that the defendant had stayed with her in Worcester, Massachusetts, on the three nights before May 29.  On re-cross-examination, she testified that the defendant was not with her on the night of May 28, 2008.  She testified that she told Timothy Duff, the federal probation officer who interviewed her after the defendant was arrested, that she and the defendant were a couple and that the defendant lived with her.

The defendant testified that he was in the silver Toyota on May 29, 2008, with Nunes, Justin deGaetano, and "another guy."  When they stopped at the Global gas station, Nunes got out to pump gas, and the defendant continued to converse with the other occupants of the car, even though he noticed what looked like "an unmarked car" parked near the gas station on the street.  He thought that it was strange that the car was parked there.  A moment later he noticed a car parking in front of the Toyota, and an agent coming toward him with a drawn gun, while he heard tires screeching and doors slamming.  One of the rear doors on the Toyota was opened and closed.

He testified that MacVane was five feet in front of him saying, "Police, don't move, put your hands up."  MacVane's gun was pointing at his chest.  He testified that he immediately put his hands up and denied reaching behind his back.  MacVane then came to the door next to the defendant, opened it and kicked the defendant in the chest near his heart while his hands were in the air.  He slumped over as a result of the kick, and MacVane grabbed him and flung him to the ground.  He felt MacVane kneeling at the top of his back.  He was yelling, "I can't breathe" and

struggling to get air.  He denied resisting MacVane and testified that his pants never slipped down. He felt MacVane striking his right shoulder and heard him yell for assistance.

He then felt other hands grabbing his arms and back and thinks that one other person helped MacVane get his hands into handcuffs behind his back.  While he was handcuffed and still face down on the ground, he felt someone pull at the top of his pants and then reach down into his underwear and pull out the package of crack cocaine from deep between his buttocks. An agent then yelled, "We have something."  The defendant testified that the package could not possibly have "popped out" of his pants. The defendant testified that he always wore his pants firmly around his waist, and that they were loose in the seat.

The defendant testified that he heard another agent say, "Where's the money?  No money."  The agents then left him propped against the car.  MacVane asked the defendant if he was all right and then called an ambulance.  The time between his first sight of MacVane's gun and his handcuffing was only 20 to 30 seconds.  MacVane did not search him after the cocaine was retrieved.  After the ambulance arrived, the paramedics asked him if he had anything that could harm them, and he told them that he had a pocket knife and some marijuana, after which someone other than MacVane searched him and removed these items along with a cell phone, box of cigarettes, 2 to 5 dollars in cash, and a Chapstick.  He denied that MacVane had held up his pants at any time at the hospital.

The defendant was interviewed by probation officer Timothy Duff on May 30, 2008 and answered questions about his personal life.  He denied telling Duff that he was living with Strong or that he and Roman were separated at the time.  He denied telling Duff that he was homeless.

He weighed 220 pounds at the time of his arrest and has lost a lot of weight since then, although he did not know what he weighed at the time of the hearing or how much weight he had

lost.  He stayed at 31 Saugus Street only on the night of May 28, 2008 and was smoking crack and marijuana every day, although he did not recall smoking either on May 29, 2008.  He denied telling anyone that he put his hands behind his back while he was still in the Toyota because he knew that he was going to be handcuffed.  He always does what the police tell him to do.

The defendant testified that it should have been easy to handcuff him when he was on the ground next to the Toyota.  When asked how he retrieved the drugs that he carried between his buttocks, he said that he reached inside his belt and his pants and pulled it out.  He did not recall being processed after his arrest on May 29, 2008, or telling anyone that day that he weighed 195 pounds.

Duff, called by the government as a rebuttal witness, testified that he prepared the pretrial services report in this case.  He interviewed the defendant on June 2, 2008.  The defendant told him that he was staying at 31 Saugus Street in Portland but was between residences due to a recent separation from Roman, who lived in Worcester.  He told Duff that he had put his hands up when ordered to do so by MacVane and at some point was putting his hands behind his back to be handcuffed before MacVane kicked him.  He said that he struggled while on the ground due to his difficulty breathing, not because he was resisting arrest.

### III.  Motion to Dismiss

The defendant seeks dismissal of the indictment on the grounds that his due process rights were violated when law enforcement agents failed to preserve potentially exculpatory evidence or to notify him of such evidence "until after it was lost or destroyed."  Defendant[']s Motion to Dismiss Indictment or Impose Discovery Sanctions ("Motion to Dismiss") (Docket No. 56) at 1.  Because I credit the testimony of Patel that no videotape of the relevant events of May 29, 2008, exists, I need not reach the defendant's arguments.

15

Patel's testimony was inconsistent in that he both acknowledged telling Perry that the camera focused on the pump area might have been moved by someone cleaning the window after May 29 and also testified that no camera was recording the pump area on that date.  However, I credit the latter testimony, which Patel repeated emphatically and consistently several times under oath at the hearing.  Patel also testified that he told different people different things about the capabilities of the video recording system at his store as it existed on May 29, out of caution (to make his employees and others believe the monitoring system was better than it was) and anger (at what he viewed as intrusive questioning after May 29).  The issue is further confused by the facts that Patel's video system *was* monitoring the inside of his convenience store on May 29, that since May 29, it had been upgraded and modified as to both inside and outside monitoring and recording, and that the most obvious four cameras on the canopy had never worked since Patel took ownership of the gas station.  This mixed and frequently-changing state of the video system, coupled with Patel's demonstrated difficulty with idiomatic English, which also could have contributed to misunderstanding, leads me to accept Patel's clear and unequivocal testimony at the hearing that there was never a tape of the events at the gas pumps on May 29.  I reject the speculation of defense counsel that, because his store sells items that could lead law enforcement to have a discomfiting interest in his business, Patel lied in order to curry favor with Wolf, Barnard, and/or the assistant United States attorneys involved in this case.

Even if there had been a videotape, however, I would still recommend that the motion to dismiss[1] be denied.  The government contends that it has no duty, as a matter of law, to preserve evidence that is in the possession and control of third parties. Government's Opposition to

---

[1] The motion to dismiss asks, in the alternative, for "discovery sanctions," which turn out to be suppression of the drugs seized from the defendant, the same relief sought in the motion to suppress.  Motion to Dismiss at 14-15. Because the defendant's argument in support of his motion to suppress is virtually identical to his motion in support of his motion to suppress, I will deal with the requested "sanctions" in my discussion of the motion to suppress.

Defendant Anthony Jones' Motion to Dismiss ("Dismissal Opposition") (Docket No. 58) at 8-10. This argument has a certain appeal on its face, but the parties agree that it has not been adopted in the First Circuit. From all that has been presented to the court by the parties, it has also not been adopted by any other federal court in a case close enough on its facts to provide persuasive authority for its adoption here. Even when potentially exculpatory evidence does not come into the possession or control of the government, courts appear to hold that there is no due process violation only if the fact that the government never obtained the evidence is due to oversight or lack of knowledge rather than deliberate choice or even negligence. *Colon v. Kuhlmann*, 1988 WL 61822 (S.D.N.Y. June 3, 1988), cited by the government, is illustrative. *Id*. at 10. The district court in that case observed:

> Just as the due process clause does not require states to perform particular tests in connection with criminal cases, it does not require that particular evidence be gathered. In this case, the victim's underpants were never in the state's possession. Thus, they were not lost or destroyed through any intentional or negligent act attributable to the state.

1988 WL 61822 at *5. In the case at hand, the defendant contends that the videotape, if it existed, was destroyed as the result of an intentional act by Wolf, which would be attributable to the prosecution.

The case law dealing with destroyed or lost evidence distinguishes between "apparently exculpatory" evidence and "potentially useful" evidence when a due process violation is alleged. *Arizona v. Youngblood*, 488 U.S. 51, 56-58 (1988). Good or bad faith is irrelevant when the government fails to disclose to the criminal defendant exculpatory evidence. *Id*. at 57. When the evidence is only shown to have been potentially useful, there is no denial of due process unless the defendant can show bad faith on the part of the police. *Id*. at 58. *See also United States v. Garza*, 435 F.3d 73, 75 (1st Cir. 2006).

The defendant here asks the court to infer that the videotape was exculpatory from the fact that the agents involved in the case failed to retrieve it when an assistant United States attorney directed them to do so.  Motion to Dismiss at 10-11.  This is not sufficient to carry the defendant's burden of proof on this issue.[2]  Such an interpretation would read the Supreme Court's distinction between "apparently exculpatory" evidence and "potentially useful" evidence out of the common law.

The defendant next asks the court to infer bad faith from the agents' failure to retrieve the tape, for purposes of a claim that the tape was "potentially useful" evidence.  Motion to Dismiss at 11.  Assuming that the tape would have been "potentially useful," the defendant again asks the court to make the failure to obtain the tape itself all that he need prove.  As the First Circuit has noted in this context, "intentionality is not enough to show bad faith."  *Garza*, 435 F.3d at 75. The defendant must "show independent evidence that the [agents were] somehow improperly motivated."  *Id.* (internal punctuation omitted).  He has not done so.

 For example, the defendant could have shown that Wolf knew, or at least was willfully blind to the fact, that the gas station's tape of the events of May 29 would be taped over in the normal course of business at the station.  But, Wolf was not questioned on this point during his extensive testimony at the hearing.

The defendant argues, in the alternative, that the government's failure to notify him that the gas station "had surveillance equipment and that the agents believed there was surveillance footage of the arrest of the Defendant on May 29, 2008" constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).  Motion to Dismiss at 12-14.  The videotape in

---

[2] With respect to MacVane, who counsel for the defendant argued must be deemed to have wanted to conceal the tape because it could be used against him in a civil lawsuit, it should be noted that his interaction with the defendant took place on the far side of the gas pump island from the store and on the far side of the car, making it unlikely that the tape could have shown much detail about the encounter.

this case, if it existed, cannot be forced into the confines of *Brady*. First, and most important, it has not been established that the videotape would have constituted "evidence favorable to [the] accused." *Brady*, 373 U.S. at 87. Second, none of the case law cited by the defendant requires the government to inform a defendant of the location of possible evidence that might be favorable to the defendant, when that location is not within the government's control and the government does not itself have the evidence. Third, from all that appears in this case, the government *did* make counsel for the defendant aware, well before trial and before the scheduled hearing on the defendant's motion to suppress, of the facts known to it concerning the surveillance equipment at the gas station. Motion to Suppress at 4-5. Had any *Brady* obligation attached to the government's knowledge, it was met by this disclosure.

The motion to dismiss should be denied.

## IV.  Motion to Suppress

The defendant seeks suppression of the crack cocaine and "all testimony related to" it, as well as the knife he carried, and his "presence in the vehicle." Defendant[']s Motion to Suppress ("Motion to Suppress") (Docket No. 31) at 1 & n.1. He contends that he was arrested at the gas station and that the law enforcement officers involved in that arrest lacked probable cause to arrest him. *Id*. at 9-11. The government asserts that the circumstances at the gas station gave rise only to an investigative stop of the silver Toyota, to which a different legal standard applies. Government's Opposition to Defendant Anthony Jones' Motion to Suppress ("Suppression Opposition") (Docket No. 37) at 6-7.

Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A stop must be supported by a reasonable and articulable suspicion of criminal activity. *Berkemer v.*

19

*McCarty*, 468 U.S. 420, 439 (1984).  The detention must be reasonable under the circumstances.

*Whren v. United States*, 517 U.S. 806, 809-10 (1996).

> Reasonable suspicion, as the term implies, requires more than a naked hunch that a particular person may be engaged in some illicit activity. By the same token, however, reasonable suspicion does not require either probable cause or evidence of a direct connection linking the suspect to the suspected crime.  Reasonable suspicion, then, is an intermediate standard – and one that defies precise definition.  Its existence must be determined case by case, and that determination entails broad-based consideration of all the attendant circumstances.  In mulling those circumstances, an inquiring court must balance the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.  To keep this balance true, the court must make a practical, commonsense judgment based on the idiosyncracies of the case at hand.

> To work the calculus of reasonable suspicion in the context of a traffic stop, an inquiring court must ask whether the officer's actions were justified at their inception, and if so, whether the officer's subsequent actions were fairly responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed.  Formulating the answers to these queries demands a margin of flexibility.  After all, while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the court of the detention.

*United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (citations and internal punctuation omitted).

In this regard, law enforcement officers may rely on anonymous tips, provided the tips bear indicia of reliability.  *Alabama v. White*, 496 U.S. 325, 328-39 (1990).  Counsel for the defendant emphasized in oral argument that the Supreme Court has said that anonymous tips are inherently unreliable, but the authority she cites for this assertion, Defendant['s] Reply to Government's Opposition to Defendant's Motion to Suppress ("Suppression Reply") (Docket No. 39) at 2, is not so stark.  In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court again evaluated the information known to police in terms of indicia of reliability and found "the bare

20

report of an unknown, unaccountable informant who neither explained how he knew about [the crime] nor supplied any basis for believing he had inside information about [the defendant]" to be insufficient to provide reasonable suspicion.  *Id*. at 271.

Here, the agents verified aspects of the anonymous caller's information, and the caller both explained how he knew about the silver Toyota and its occupants and provided a basis for believing that he had inside information about the defendant.  While it is true, as the defendant points out, that three, rather than all four, of the occupants of the Toyota were African-American men, and that the drug-sniffing dog, in a limited exposure to the silver Toyota, did not indicate that any illicit drugs were then stored in the car, many other elements of the information provided by the informant were verified by the agents' observations before the events at the gas station.  Among those elements are the following:  (1)  Maria Strong resided at 31 Saugus Street, as the informant said; (2) the cars that the informant had described were in the driveway at 31 Saugus Street; (3) the silver Toyota was parked where the informant said it would be; (4) the silver Toyota had a Massachusetts license plate, and the informant had said that its occupants were from Massachusetts; and (5) a black male came from the area of 31 Saugus Street, got into the silver Toyota, and drove it to the driveway of 31 Saugus Street, where three other males got in.  In addition, the informant explained that he had purchased and used crack cocaine inside the house at 31 Saugus Street and had been inside the house while the occupants of the silver Toyota were there.  This is the basis for the informant's knowledge that was missing in *J.L.*

This was not all that was known to the agents before the silver Toyota was stopped.  They also knew that Maria Strong had been arrested in at least one previous crack cocaine trafficking case, and that Lemmie Nunes, who had rented the motel room used in another drug trafficking

case, was the registered owner of the silver Toyota.  Taken together, this information established reasonable suspicion for purposes of a "traffic stop," which is what occurred at the gas station.

Next, it is necessary to consider the defendant's contention that what occurred at the gas station on May 29, 2008, was not a mere traffic stop, but rather a *de facto* arrest, requiring the agents to have had probable cause to arrest before acting.  *See United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998).  The defendant's motion recites the applicable case law but does not discuss what it was about the events of May 29 that constituted a *de facto* arrest.  Suppression Motion at 8-9.  At oral argument following the hearing, counsel for the defendant contended that the following facts established a *de facto* arrest: (1) seven agents in six cars surrounded the silver Toyota; (2) the agents went in to the stop "guns blazing, all out"; (3) all but one of the agents had their guns drawn; (4) each agent had targeted a different individual and each was individually restrained; (5) the occupants of the silver Toyota were not given an opportunity to submit; and (6) MacVane used excessive force and exceeded the degree of force permitted under applicable case law for his own protection.

Some of these "facts" are not facts at all.  No guns were "blazing" during the incident; none were fired.  The agents did not "go all out" when entering the gas station; I credit Wolf's testimony that he always instructed agents under his direction not to enter a scene at a high rate of speed or with tires screeching, but rather to proceed "in a careful hurry."  Only MacVane and Guay testified that their guns were drawn as they approached the silver Toyota.  The fact that each agent was assigned responsibility for one of the four occupants of the car is certainly the most practical way to deal with an investigatory stop of four individuals in a single car whom the agents believed to be armed.  I do not see, as a practical matter, how the occupants could have

22

been restrained other than individually.  Significantly, at least two of the other occupants of the car were given an opportunity to submit and did so, without incident.

In cases involving the scope of an investigatory stop that is alleged to have constituted a *de facto* arrest, the court must examine whether there was restraint on the defendant's freedom of movement of the degree associated with a formal arrest.  *United States v. Maguire*, 359 F.3d 71, 77 (1st Cir. 2004).  The use of drawn weapons, standing alone, does not transform an investigatory stop into a *de facto* arrest.  *Id*. at 78.  As the First Circuit has noted, drug trafficking is "a pattern of criminal conduct rife with deadly weapons."  *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987).   In the case at hand, the officers believed that at least two of the occupants of the car, all of whom they believed to be involved in trafficking crack cocaine, were armed.  Guay and MacVane were justified in approaching the car with guns drawn under the circumstances.

Putting a defendant on the ground when the officer has reasonable concern for his own safety does not exceed the scope of an investigatory stop, particularly when the officer's suspicion is heightened during the stop.  *Maguire*, 359 F.3d at 78-79.  Blocking a suspect's vehicle with police vehicles does not transform a stop into an arrest.  *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993).  Nor does the use of handcuffs.  The circumstances supported a reasonable belief by the agents that the temporary use of handcuffs on all of the occupants was necessary to carry out the legitimate purposes of the stop without exposing themselves or the public to undue risk of harm.  *Acosta-Colon*, 157 F.3d at 18-19.  The number of officers similarly did not make the stop into an arrest.  *See, e.g., United States v. Zapata*, 18 F.3d 971, 976 (1st Cir. 1994).  In *United States v. Trueber*, 238 F.3d 79, 94 (1st Cir. 2001), the First Circuit found that the fact that five officers were involved in the stop, when their conduct was measured

23

and not bellicose and no more than two were in direct proximity to the defendant, did not create a *de facto* arrest. Here, three agents were, for a brief time, in direct proximity to the defendant, but that was due to their reasonable, although possibly mistaken, belief that the defendant was resisting arrest.

That leaves the allegation that MacVane used excessive force against the defendant, and that the use of that degree of force converted the stop into an arrest. This allegation is not discussed in the motion or the defendant's reply memorandum, and no authority was cited in support of it during oral argument. Use of force that is not disproportionate to the purposes of the stop does not turn a stop into an arrest. *Hill v. Village of Crete*, 2008 WL 4559859 (N.D.Ill. Oct. 6, 2008), at *3 n.2. The question for the court is whether the officer's use of force was reasonable in light of all the circumstances. *Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008). Here, I have already concluded that the stop of the car in which the defendant was a passenger was justified by a reasonable suspicion, and that that level of justification was sufficient at the outset of the stop. Beyond that, MacVane reasonably believed that the defendant might be armed. I find more credible MacVane's testimony that the defendant did not put up his hands when ordered to do so than I find the defendant's testimony that he immediately complied. MacVane then opened the door next to the defendant and saw one of his hands moving toward his lower back, where weapons are often carried.[3] At that point, MacVane was entitled to act with sufficient force to neutralize what he reasonably perceived to be a threat to his safety, and possibly to that of others, without turning the stop into an arrest.

Neither side has provided the court with any guidance on the question of whether the precise method chosen by MacVane – a kick to the chest – could be considered sufficiently

---

[3] I do not find credible the defendant's denial that he made such a move, particularly given the presence of a package of crack cocaine in that approximate location which, if it could be removed from the defendant's body before its discovery, would be much more difficult to tie to the defendant in a car that was not his.

24

excessive under the circumstances to transform the stop into an arrest. The purpose of the stop was to determine whether the occupants of the car were dealing in or carrying crack cocaine, as the informant had reported. MacVane had been told that two of the occupants might be armed. His use of a kick to the chest with the degree of force reported by the defendant is troubling, but the defendant has offered no other possible means by which MacVane might have achieved his rational goal less intrusively. Ultimately, I conclude that MacVane's use of the kick was reasonable, in that the facts available to him at the time would warrant a person of reasonable caution in the belief that the use of the kick was appropriate. *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1997). *See also Jewett v. Anders*, 521 F.3d 818, 826-27 (7th Cir. 2008). Accordingly, there was no arrest prior to the discovery of the crack cocaine, and the government does not need to demonstrate probable cause for an arrest of the defendant before that discovery.

The defendant also contends that Bruni reached down into the defendant's pants to search for drugs and that his search exceeded the limited pat-down frisk allowed during an investigatory stop, making it necessary to suppress the crack cocaine. Motion at 12. I find credible Bruni's testimony that he saw a corner of a clear plastic packet extending above the waistband of the defendant's boxers while the defendant was on the ground. A struggle had just taken place, and it is not remarkable that the defendant's pants slipped down as he was dragged from the car and struggled with MacVane and others on the ground. I also credit Bruni's denial of the defendant's testimony that he reached far down into the defendant's buttocks area, under his clothing, after the defendant was handcuffed. I do not credit the testimony of the defendant and his girlfriend that he wore his pants belted at the waist too tightly that day to allow the packet of drugs to work its way up to the waistband of his boxers, given his own testimony that, when he wanted to

retrieve drugs that he carried in that manner, he simply reached behind his back and put his own hand down his pants.  Nor do I find persuasive the argument of defense counsel that, because Bruni had been involved in a recent arrest of an individual who carried cocaine in his buttocks, he must have reached down into the defendant's pants to search for drugs without seeing any indication that any contraband might in fact be there.

The defendant argues that the crack cocaine was not in plain view because his pants could not have slipped down, the drugs could not have been felt "without assistance by the agents," and the agents lacked probable cause to search or arrest him.  Motion at 12-13.  I have already concluded that the agents did not need probable cause under the circumstances.  The defendant offered no evidence to support his assertion that the packet could not have been felt through his clothing, and, in any event, the government does not claim that the packet was found in that manner.  I conclude that a portion of the packet was in plain view to Bruni, justifying his seizure of it.  *See, e.g., United States v. Taylor*, 511 F.3d 87, 91 (1st Cir. 2007) (that butt of gun was visible beyond edge of towel after defendant left his vehicle made seizure of gun justified under plain view doctrine).

The motion also seeks suppression of "the knife disclosed to paramedics," Motion at 1, but neither the motion, the reply memorandum, nor defense counsel's oral argument addressed this request.  The same is true of a request to suppress the defendant's "presence in the vehicle." *Id*.  Issues adverted to in such a glancing manner, without any developed argumentation, are deemed waived.  *See, e.g., United States v. Bartelho*, 129 F.3d 663, 675 n.11 (1st Cir. 1997); *United States v. Jones*, 2006 WL 763124 (D. Me. Mar. 24, 2006), at *7 n.7.  Even if the issue had not been waived, however, the defendant's testimony was that he voluntarily provided the knife to paramedics called to the scene to treat and transport him when they asked whether he

26

had anything that could hurt them.  That scenario is not one involving a search of any kind, let alone one that may be ascribed to the government.

### V.  Conclusion

For the foregoing reasons, the defendant's motion to reconsider (Docket No. 76) is **DENIED**, and I recommend that the proposed findings of fact be adopted and the defendant's motions to dismiss and suppress be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of November, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge